CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, a corporation, Appellant,

v.

Raymond C. KIFER, Appellee.

No. 4859.

United States Court of Appeals Tenth Circuit.

Oct. 30, 1954.

Rehearing Denied Nov. 26, 1954.

J. I. Gibson, Oklahoma City, Okl., (Savage, Gibson, Benefield & Shelton, Oklahoma City, Okl., on the brief), for appellant.

Rex H. Holden, Oklahoma City, Okl., for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

PHILLIPS, Chief Judge.

Kifer, an employee of the Chicago, Rock Island and Pacific Railroad Company,[1] brought this action under the Federal Employers' Liability Act[2] to recover damages for personal injuries sustained during the course of his employment by the Railroad Company as a switchman at the Union Station in Oklahoma City, Oklahoma.

The jury returned a verdict in favor of Kifer for $88,666. The Railroad Company moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. Both motions were denied and the Railroad Company has appealed.

The Union Station at Oklahoma City is a passenger terminal station, jointly operated by the Railroad Company and the Frisco Railway Company. There are nine pairs of tracks adjacent to the station, running east and west, separated by concrete platforms running parallel to the tracks. Each platform is approximately 12 inches higher than the adjacent rail. There is about one inch clearance between the edge of each platform and a car moving on the rails.

At about 6:00 a.m., on the morning of August 14, 1952, the Railroad Company's eastbound passenger train 52 arrived from the west on Track 7. Kifer was a member of a five-man switching crew.

It became the duty of the crew to remove certain cars from the train and attach a diner to the train. The crew was working with a single unit diesel switch engine. The crew removed the engine from the train and coupled the switch engine to the baggage car on the east end of the train. After the baggage car was coupled to the train, Kifer signalled the switch engine engineer for a back-up movement in an easterly direction. Kifer rode the side of the engine until it reached the cross-over switch from Track 7 to Track 8, the latter track being located south of Track 7. Kifer then left the switch engine to set the switch for a movement west on Track 8. The engine at that time was headed west. After the switch was set, Kifer signalled the engineer to move west, slowly pushing the cars of the train onto Track 8. During that operation, Kifer rode on the northwest corner of the lead car with his feet in the upper sill step, which is about one foot above the lower sill step. From that position he passed signals to the engineer, who was on his side of the train, and moved past the point where, later, the accident causing his injuries occurred. During the switching movement westward on Track 8, Kifer was looking to the west, the direction of the movement, in the performance of his duty to see that everything was clear before the cars were moved onto that track. After the cars were placed on Track 8, the baggage car was uncoupled from a railroad Post Office car. Thereupon, Kifer gave the signal to the engineer to back up eastward on Track 8. When the train started to move eastward on Track 8 at a speed of from three to six miles per hour, Kifer stepped on the lower sill step and took hold of the projecting grab iron. For the first 10 to 20 feet, Kifer was looking westward in the performance of his duty to see that the uncoupled cars did not move in either direction. After he observed that the cars were not in motion, he turned to the east. He testified that when he did so, "the bright

1. Hereinafter called the Railroad Company.

2. 45 U.S.C.A. § 51 et seq.

morning sun hit me in the eyes and I couldn't see anything for a few minutes there, it just blinded me." He said he shook his head a little bit and glanced about and when he looked around he was right against a four-wheeled baggage truck parked on the adjacent platform. When he saw that he could not clear the truck he tried to swing his body around to the end of the car, but was unable to do so in time to avoid being struck by the baggage truck. He was knocked off the baggage car. The switch engine had moved approximately 50 to 75 feet during the backing movement, before the accident occurred.

The baggage truck struck Kifer on the left side between the hip bone and the short ribs and caused him to fall on the rail nearest the platform. He suffered temporary unconsciousness, but soon was able to crawl onto the platform, but was unable to rise. He was removed to a hospital, where he remained five days. He complained of pain in his back and left side. Diathermy treatments and sedatives were administered. After he returned to his home from the hospital sedation was continued. He received treatments from a chiropractor on the Railroad Company's staff, which were helpful but did not give permanent relief. The chiropractor advised him to try to work again. Kifer worked 11 out of 15 days in October, 1952, but then left the Railroad Company's employment permanently because he believed he was physically unable to continue that kind of work.

The baggage truck was equipped with automatic brakes, which were set at the time of the accident. The side of the truck adjacent to the rails was only nine inches from the edge of the platform curb, and created an unsafe place for the switchmen to work. At the time of the accident, Kifer was riding in a normal position for a switchman engaged in his type of work.

Kifer did not know whether the baggage truck was in the same position at the time of the accident that it was when he passed it in the switching movement prior to the accident. The engineer testified that the truck was in the same position during both movements.

Prior to the accident, reports had come to the Railroad Company that baggage trucks were being parked too close to the rails, creating a hazard to switchmen carrying out switching operations at the Union Station. Such parking violated rules and regulations of the Railroad Company.

Continuously, from the time of the accident, Kifer suffered pain in his neck and lower back, accompanied by severe headaches and muscular spasms.

On March 19, 1953, Doctor Gerster W. Brown, a specialist in traumatic surgery, examined Kifer. He testified that Kifer complained of headaches, cervical pain and tension, pain in the mid-lower back at about the level of the fourth lumbar vertebra and anesthesia of the left lower extremity; that Kifer had the appearance of extreme lassitude and an expression of anxiety; that neurological findings revealed absence of the Achilles reflexes bilaterally, a boot-like anesthesia of the left lower extremity, extremely sluggish patella reflexes, a tremor of the hand, and some spasticity of the posterior cervical musculature. He testified that, in his opinion, Kifer was suffering from traumatic neurosis, which is definitely a disabling ailment. He concluded that the accident was the precipitating cause of the traumatic neurosis and that the condition was probably of a permanent nature. He testified that it was as disabling as a severe physical injury, such as a broken back or a broken arm. He stated, in his opinion, that as a result of the accident Kifer was to a large degree permanently disabled from doing any ordinary manual labor. The Railroad Company introduced contradictory evidence to the effect that Kifer's condition was due to bad posture and not to the accident and that he was not permanently disabled from doing ordinary manual labor.

Kifer had an eighth grade education and began working when he was about

16 years of age. He worked as a farm laborer and truck driver. He entered the Armed Services in 1942. While in the Army he drove a truck and hauled troops and supplies. He was discharged from the Army in 1945. After leaving the Army he did truck driving and ordinary manual labor until he was employed by the Railroad Company. Before he entered the employ of the Railroad Company, he was examined by a company doctor and thereafter took two periodic examinations and on each occasion was advised that he was sound physically. Prior to the accident in question, he had never sustained serious injuries. He was 32 years of age at the time of the accident. He had a life expectancy of 33 years. His earnings as a switchman for the 12 months immediately preceding the accident, less income taxes, aggregated $3,917.87. Had his earnings continued at that rate, at the end of his life expectancy he would have earned more than $125,000, and in approximately 23 years he would have earned the amount of the verdict.

■ We think there can be no doubt that the parking of the truck so near to the railroad rails as to endanger the switchmen constituted actionable negligence on the part of the Railroad Company and that under the facts the jury was warranted in finding that that negligence was the proximate cause of the injury.

■ Whether Kifer failed to keep a lookout and, if so, failed to exercise that degree of care which a reasonable person, under the existing circumstances, would have exercised for his own safety, under the evidence was a question with respect to which the minds of reasonable men might differ, and, therefore, the issue of contributory negligence was one of fact for the determination of the jury. It should be observed that Kifer testified that he did look, but was blinded by the sun, and the instant he realized his danger he undertook to avoid the accident, but was unable to do so.

■ Counsel for the Railroad Company requested an instruction on contributory negligence. It was incomplete, in that it did not embrace the established test for determining contributory negligence. If given, in effect it would have instructed the jury that if Kifer could have avoided the accident by the diligent use of his sense of sight, and if he failed to look where he was going, they should find him guilty of contributory negligence. It would not have directed the jury to take into consideration all of the surrounding facts and circumstances in determining whether Kifer exercised that degree of care, which an ordinarily prudent person would have exercised for his safety, under the circumstances, and it confined the jury's consideration to the particular circumstances narrated in the instruction and omitted any reference to other important circumstances. It was properly refused.[3]

■ The court gave an instruction on the issue of contributory negligence. It was incomplete and imperfect in certain particulars, but counsel for the Railroad Company made no objection and took no exception to the instruction as given. The Railroad Company, therefore, is precluded from assigning such instruction as error under Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

■ The Railroad Company urges that the verdict was excessive and that the trial court abused its discretion in not granting a new trial on that ground. A Circuit Court of Appeals may not review the action of a District Court in granting a motion for a new trial on the ground the damages awarded by the jury were excessive, because that is an error of fact.[4] Our province is limited to de-

3. Grand Trunk Railway Co. of Canada v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L. Ed. 485; Rio Grande Western Ry. Co. v. Leak, 163 U.S. 280, 288, 16 S.Ct. 1020, 41 L.Ed. 160; Carpenter v. Connecticut General Life Ins. Co., 10 Cir., 68 F.2d 69, 73.

4. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481, 53 S.Ct. 252, 77 L.Ed. 439.

termining whether the trial court, in denying the motion, abused its discretion.[5] Ordinarily, it will not be held that the trial court abused its discretion in denying a motion for a new trial on the ground that the verdict was excessive, unless it affirmatively appears that it resulted from bias, prejudice, or passion.[6] There is nothing in the record in the instant case to indicate that the jury was influenced by passion or prejudice. The case was properly tried. The record reflects no appeal to the passion or prejudice of the jury. Accordingly, we conclude that the trial court did not abuse its discretion in denying the motion for a new trial.

Affirmed.

5. Smith v. Welch, 10 Cir., 189 F.2d 832, 837; Dubrock v. Interstate Motor Freight System, 3 Cir., 143 F.2d 304, 307, 308, certiorari denied 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 613.

6. Oklahoma Natural Gas Co. v. McKee, 10 Cir., 121 F.2d 583, 586; Snowden v. Matthews, 10 Cir., 160 F.2d 130, 131.

