WHITE MOTOR CORPORATION, an Ohio corporation, and Freight-Liner Corporation, a Nevada corporation, Appellants,

v.

Finis STEWART, and Lee Way Motor Freight, Inc., a Delaware corporation, Appellees.

No. 72–1040.

United States Court of Appeals, Tenth Circuit.

Aug. 11, 1972.

Rehearing Denied Sept. 5, 1972.

Certiorari Denied Dec. 11, 1972. See 93 S.Ct. 561.

Clyde J. Watts, Oklahoma City, Okl., for appellants; G. Kent Fleming, of Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., of counsel.

Ben T. Lampkin, Jr., and John W. Norman of Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, Oklahoma City, Okl., for appellee Finis Stewart.

Lawrence E. Hoecker, of Pierce, Couch, Hendrickson, Gust & Short, Oklahoma City, Okl., for appellee (intervenor) Lee Way Motor Freight, Inc.·

Before BREITENSTEIN, HILL and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This diversity action is a products liability case in which Oklahoma law of implied warranty of fitness for intended use was applied. Plaintiff-appellee Stewart, a long-haul truck driver for Lee Way Motor Freight, the intervenor-appellee, received serious injuries when his truck went out of control, left the highway and turned over. The incident occurred on a clear night in good weather while Stewart was driving a tractor-trailer combination which had been manufactured by defendant-appellant Freightliner Corporation and sold by it through White Motor Corporation to appellee's employer Lee Way.

Stewart testified that he experienced a sudden vibration and inability to control or steer the truck. He struggled with the steering wheel in a vain effort to prevent the truck from going hard to his right. He let up on the accelerator in an attempt to keep the vehicle on the roadway until it would roll to a stop from its 60 mile per hour speed, but after traveling 2000 feet it finally veered to the right and off the shoulder, reversed directions and overturned, landing on its left side.

Stewart was pinned in the wreckage for over an hour, his right leg being caught in the clutch pedal and his left leg lying out the door. He was hospitalized for 237 days with a compound fracture of the left leg and internal injuries consisting of a hole in the lower colon.

He had very limited use of his leg; he presently wears a brace, walks with a cane, and cannot drive a truck. At the time of the trial there was a possibility that the leg might have to be amputated.

The evidence disclosed that there had been a failure in the right equalizer bracket-radius rod assembly of the tractor's rear suspension system.[1] More particularly, the bolts holding the equalizer bracket to the frame were sheared off. An important factual issue was whether the bolts were overloaded or defective when possession was transferred from appellants to Lee Way or whether they had been overtorqued or had failed due to other improper maintenance on the part of Lee Way. Defendants also argued that Stewart had gone to sleep at the wheel and that the bolts were broken by the impact of the crash. Defendants' motion for directed verdict was denied.[2]

The jury returned a verdict for plaintiff in the amount of $350,000.00. Of this amount the intervenor Lee Way was allowed $21,951.22 by way of subrogation for workmen's compensation payments made to Stewart. Defendants moved for judgment n. o. v. and for a new trial, both of which were denied.

There is a dispute in the evidence as to whether a manufacturer's defect produced this series of events. It *was* shown without dispute that after the truck came to rest, the so-called equalizer bracket-radius rod part of the tractor's rear suspension system was severed. The bolts which served to hold the equalizer bracket to the frame had sheared. Unfortunately the bolts were not preserved, but testimony was to the effect that three of the bolts were rusted suggesting that they may have failed prior to the incident while the fourth was shiny indicating that it had sheared off at the time.

The mentioned radius rod is a transverse member which connects to the axle and wheel assembly and serves to support the axle so as to prevent, in part at least, its swinging on a horizontal plane, the effect of which would be turning and loss of control.[3] Defendants offered testimony of tests which showed that the wheels did not swing even when the radius rod was dislodged.

The important factual issue at trial thus was whether the bolts were defective or overloaded at the time of sale and delivery of the truck to Lee Way or whether on the other hand the maintenance on the part of Lee Way had been faulty—whether, for example, Lee Way had overtorqued the bolts at regular 100,000 mile inspections. Defendants also have maintained that the bolts were broken by the impact of the crash. In addition to the radius rod there is a rear axle spring which gives limited and secondary support to the wheel assembly and also holds the wheels in a straight course. When the rod was separated on

1. This assembly is essential to the guidance of the truck in that it keeps the dual rear axles of the tractor in line.

2. Negligent design was also an issue but was abandoned by plaintiff before the case went to the jury.

3. Plaintiff's expert testified as follows:
   A Yes, sir, there are several points of support on this rear axle. The rear axle is supported vertically with springs which lay right here just outside the frame of the vehicle. This, the vertical support, in other words, the weight of the tractor and the weight of the trailer and the load in the trailer is pushing down on the spring and then there is another linkage that ties this drive axle to the truck and this linkage sits on either side here and there is a heavy link called a radius rod that ties this back axle to the frame of the truck so you can have the push. In other words, the spring supports only the weight. There is nothing to keep the axle from moving back and forth and there has to be a rather heavy member to support the load. When you start driving, the power is applied to the drive wheels and if they weren't supported, they would tend to move out. But when you apply the brakes, they would stop and the vehicle would go on. Of course, you have a similar mechanism on the front axle, radius rod. This is the radius rod on the front axle mounted kind of at an angle to the one on the back.

the right side this spring became dislodged and control of the rear wheels was lost. The tractor was just over a year old and had been driven 237,448 miles. The testimony showed that this is not regarded as high mileage. Trucks of this kind have an average life of a million miles over a period of five years. Supporting bolts such as those holding the radius rod bracket here are expected to last for the entire life of the truck.

The main contention on this appeal is, as has been noted, that of insufficiency of evidence to establish existence of a defect present in the equalizer bracket-radius rod assembly at the time of delivery. Defendants complain particularly about the disappearance of and failure to produce the bolts which failed.

Further challenges by defendants are first, the alleged excessiveness of the verdict; secondly, the failure of the trial court to submit the issue of contributory negligence of Lee Way to the jury; third, the alleged error of the court in not submitting the photograph of the equalizer bracket to the jury.

■ The evidence in support of proximate cause does not pose a problem. No strain on the deductive process is required to conclude that the failure of the bolts caused the truck to leave the highway, turn around and finally overturn. This is not only supported by the circumstances; the expert witness Halley gave a positive opinion that this occurred.

The evidence offered to establish the existence of a defect attributable to the defendants is less conclusive. The experts on both sides testified as to this

but neither took a doctrinaire stand. Plaintiff's expert, Professor Halley, testified that inadequate shear strength or an overload on bolts which were too small or too few (a defect in design or manufacture) was the number one possibility. In addition, he conceded that there were other possibilities such as lack of maintenance and excessive torquing. The case was thus presented to the jury on circumstantial evidence, and the evidence must be determined sufficient or insufficient based on the strength of the inferences that defendants were responsible for the bolts failing.

In accordance with Oklahoma law,[4] the trial court charged the jury that the essential elements of an action based on manufacturer's or seller's breach of implied warranty of fitness required proof (preponderance of evidence) by the plaintiff that the claimed defect or defects constituting a breach of implied warranty of fitness existed at the time that the vehicle left the hands of the manufacturer or seller and must also prove that the claimed defect was the proximate cause of the accident and resulting injury or loss.[5]

## I.

■ The Oklahoma law applicable to products liability cases proceeds on the doctrine of implied warranty of fitness for intended use. To recover, it must be established that there existed at the time of transfer from the manufacturer a defect which proximately caused the injury. Marathon Battery Company v. Kilpatrick, 418 P.2d 900, 902 (Okl.1966). The Oklahoma Supreme Court said that

---

4. Marathon Battery Company v. Kilpatrick, 418 P.2d 900, 902 (Okl.1966), and Speed Fastners, Inc. v. Newsom, 382 F.2d 395 (10th Cir. 1967).

5. The essential elements described by the court in its charge were:

FIRST: That the defendants breached an implied warranty of fitness with reference to said motor vehicle as claimed by the Plaintiff regarding the radius rod bracket and equalizer assembly of said motor vehicle and that

each Defendant breached said implied warranty of fitness prior to the time it relinquished possession or control over said motor vehicle, and,

SECOND: That said breach of an implied warranty of fitness in connection with the radius rod bracket and equalizer assembly involved was a proximate cause of the accident involved and any personal injuries or losses which may have been sustained as a result thereof.

a products case can be proven by either direct or circumstantial evidence:

> \* \* \* The primary issue involved was whether the battery exploded, and this matter explicitly was submitted to and determined by the jury. We have held consistently that in civil cases the facts are provable by direct or circumstantial evidence, or by both. And it is not required that the proof rise to that degree of certainty which will support only one conclusion to the exclusion of all others. \* \* \*
>
> 418 P.2d at 917.

The court also said:

> We are persuaded as to the correctness of both the reasoning and the rule, and hold the manufacturer's liability was established when it was shown that plaintiff was injured while using the battery for the purpose intended by reason of a defect as to which he was not aware, and could not have ascertained by examination. 418 P.2d at 915.

In *Marathon Battery* the proof of plaintiff was practically limited to the inferences arising from the happening. The battery manufactured by defendant exploded while plaintiff was holding it in his hand. The opposing argument that the specific reason for the failure had to be established was rejected. The circumstantial evidence was held to be sufficient to create a reasonable inference that some defect existed in the battery. Defendant's theory that the explosion resulted from some external agency or force was rejected by the jury.

In Ford Motor Co. v. Schweitzer, No. 43096 (Okl. June 15, 1971), a case which resembles ours, there was a failure of the tie rod assembly in the steering mechanism. A witness at the scene noticed that it was rusty except for one shiny spot on the end. There was little other proof. There, however, the car was only 12 days old, making the connection to the manufacturer somewhat more clear. This court's decision in Speed Fastners, Inc. v. Newsom, 382 F.2d 395 (10th Cir. 1967) interpreted Oklahoma law and is thus pertinent. The injury in that case resulted from the use of a powder-loaded gun in driving studs through a steel I-beam. The head of one of these studs separated from the shank and the ricocheting shank hit plaintiff and imbedded itself in his midsection. The possible explanations were overcharge of powder, improper handling, or a defect in the stud. Expert testimony showed that the tensile strength of the stud was below optimum hardness, but the expert was not positive that this condition accounted for the failure. This court in affirming the judgment noted that in *Marathon* " . . . no defect was shown . . . [the battery] simply exploded."

These cases teach that the presence of a defect can be connected to the manufacturer or seller by circumstantial evidence which is logical and reasonable; at the same time the inferences need not exclude all other possibilities, and the testimony of the expert need not be limited to a single explanation.

## II.

The trial court properly instructed the jury that the mere happening of an accident carries with it no presumption of breach of implied warranty but that the burden is on the plaintiff to establish the breach by a preponderance of the evidence.

This, of course, does not preclude a consideration of the actual occurrence and of the surrounding circumstances insofar as these explain the origin of a defect.

The truck was relatively new in relation to its life expectancy. The area was not one in which heavy maintenance was required. The bolts are expected to continue for the life of the truck. There had been checks at 100,000 mile intervals. About one in twenty-five requires tightening at the 100,000 mile check. When the bolts are tightened in Lee Way shops, the mechanics do not use a wrench which is calibrated. However, according to the evidence, a good

mechanic can tighten such a bolt to within ten or fifteen pounds. The specification in the manual calls for 90 pounds of torque, but the bolt, according to the manual, can tolerate as much as 150 pounds. The evidence of plaintiff stressed the difficulty of reaching this point. There was no showing that any of the bolts here had been in fact tightened; proof did show that the bolts are visually checked and tested and are tightened if need is found.

The bolts were shown to have sheared, and there was no showing that they had loosened, and thus the only competing or countervailing inference was that of overtorquing. Further, there was a lack of evidence that the bolts had been replaced. Lee Way showed that they infrequently substituted bolts and that when they did so they installed stronger ones.

From these basic facts it is logical to infer that it was the defectiveness in design or manufacture of the bolts which produced the failure.

While the evidence is not open and shut, and indeed it is not as strong as that which was present in *Marathon*, where the happening bespoke a defect, or as strong as that in *Speed Fastner*, where the activity was so hazardous as to render the slightest deviation from precise standards a defect, we nevertheless cannot say that the trial court erred in holding that a trier of fact could justifiably conclude that the plaintiff's thesis that the manufacturer supplied a defective equalizer bracket-radius rod assembly was more likely so than not so. There is present a logical and rational inference that the manufacturer and seller were responsible for the defect.

### III.

### THE CONTENTION THAT THE DAMAGE AWARD WAS EXCESSIVE

■■■ The applicable standard for judging excessiveness is stated in Chicago, Rock Island & Pacific Railway Co. v. Kifer, 216 F.2d 753 (10th Cir. 1954):

Our province is limited to determining whether the trial court, in denying the motion, abused its discretion. Ordinarily, it will not be held that the trial court abused its discretion in denying a motion for new trial on the ground that the verdict was excessive, unless it affirmatively appears that it resulted from bias, prejudice, or passion. · 216 F.2d at 756–757.

It was here stipulated by the parties that an officer of Lee Way would, if called, testify that Stewart's temporary earning loss from the time of the accident to the trial was $31,178.00; his future earnings based on his 1971 pay rate would have been $395,520.00 ($16,480.00 per year for 24 years). It was also agreed that any sum of money awarded could earn five percent per annum. The trial court instructed the jury in accordance with the stipulation and, in particular, told the jury that it should discount the award for future earnings by the five percent rate in view of cash payment. The evidence as to medical and hospital expenses incurred was $17,411.72; future medicals were estimated to be $22,500.00.

There was evidence that plaintiff suffered pain. He was pinned in the wreckage for over an hour and suffered continuing pain from the deformity of the leg and the numerous skin grafts which were required. At least some part of the award could have been for pain and suffering.

Defendants argue for the first time on appeal that plaintiff in the future could obtain some kind of employment and that this would reduce the future loss of earnings. But the doctor called by plaintiff testified that Stewart was totally disabled and that continued use of a leg apparatus was foreseeable. There also was the possibility of amputation and the substitution of an artificial leg. Defendants produced no testimony of their own on the issue of damages and did not make an issue of or ask for an instruction as to offsetting future earnings.

The award was not so excessive as to suggest that it was based on prejudice

and so as to call for a ruling that the trial court erred in refusing to set aside the verdict.

## IV.

### THE QUESTION WHETHER CONTRIBUTORY NEGLIGENCE OF LEE WAY COULD BAR ITS RECOVERY

■ The defendants were refused an instruction which would have told the jury that a finding of contributory negligence by Lee Way would bar any recovery by it.

■ Lee Way had intervened so as to protect its right to share in any award gained by its employee, to the extent of the workmen's compensation payments. Under Oklahoma law the payer of the workmen's compensation benefits is subrogated to the claim of the injured workman against the tortfeasor. See Travelers Insurance Company v. Leedy, 450 P.2d 898 (Okl.1969). This court has previously held that in Oklahoma contributory negligence of the employer is no defense in a direct action (which this was not) for recovery of compensation payments, since contributory negligence of the employer would not be a defense in an action by the employee. Baker v. Traders & General Insurance Co., 199 F.2d 289 (10th Cir. 1952). There is no suggestion in *Baker* that this principle changes when the employer rather than his insurance carrier exercises the right to recoup the payments required by the Oklahoma Workmen's Compensation Act, and there is no indication that the Oklahoma Supreme Court would so hold. In each instance the claimant stands in the shoes of the injured person.

## V.

### REFUSAL OF THE TRIAL COURT TO SUBMIT TO THE JURY THE PHOTOGRAPH OF THE EQUALIZER BRACKET

■ A photograph of the equalizer bracket showing its severed bolts and the rust on the ends of three of them was taken at the scene of the accident. Plaintiff attempted to get this photograph into evidence, but it was excluded as a result of the defendants' objection that an identification witness was not present. However, the photo was used by the plaintiff's expert for the purposes of his testimony, and this was not objected to. In fact, the defendants used the photograph for the purpose of cross-examining Halley. Nor was there any mention of this point when the case went to the jury. Under the circumstances, we perceive no error in the court's refusal to comply with defendants' belated request that the photograph be submitted.

The judgment is affirmed.