**Ervin Donald REDMOND, Plaintiff,**

v.

**William O. BAXLEY, Charles Egeler, Perry M. Johnson, Defendants.**

Civ. A. No. 5–72333.

United States District Court,
E. D. Michigan, S. D.

Sept. 7, 1979.

William H. Van Duzer, Lansing, Mich., for plaintiff.

Peter J. Treleaven, Asst. Atty. Gen., Lansing, Mich., for defendants.

MEMORANDUM OPINION AND ORDER CONCERNING DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR NEW TRIAL

PHILIP PRATT, District Judge.

This case was brought under 42 U.S.C. § 1983[1] by a prisoner who alleged that he was raped by three inmates while in a prison infirmary. The plaintiff sought to recover damages from two state officers, a nurse-supervisor and the Director of the state Department of Corrections, who were alleged to have been responsible for the impairment of his civil rights. At the close of the trial the jury returned a verdict against both defendants and in favor of the plaintiff for actual and compensatory damages in the amount of $130,000.

The evidence at trial, viewed in the light most favorable to the plaintiff, showed the following.

The plaintiff was transferred from a county jail to the State Prison of Southern Michigan at Jackson on April 21, 1974. Because he was 18 years old, diabetic, and potentially vulnerable to the coercion of hardened prisoners, he was placed in the youthful offenders section of the prison infirmary. This section consisted of six cells separated from the rest of the infirmary cells by a heavy wire mesh screen with locked access door. Within the screened-off section the prisoners were not locked in their respective cells, except at night. The nearest prison officer or guard on the floor (aside from a roving inmate nurse who patrolled the whole floor) was defendant Baxley (who was a nurse supervisor untrained in custodial techniques) located in an office "half a football field" away from the youthful offenders section.

The plaintiff was approached twice on his first day in the screened-off section at Jackson Prison, by three other inmates desiring sex. The first time he ran out to the wire mesh barrier and yelled for defendant Baxley. Defendant Baxley could not remember his response, but the plaintiff and another inmate present at the time testified that Baxley ignored the plea for help, basically telling the plaintiff to take care of himself. The inmate nurse did come to see what was wrong, but the plaintiff, intimidated by the looming presence of his three attackers, remained silent. A few hours later the three approached him again, this time forcibly raping the plaintiff. As a result of this experience the plaintiff suffered some bodily injuries and drastic psychological problems.

Defendant Johnson was involved in this incident in that he had been warden at Jackson Prison until his appointment as Director of the State Department of Corrections a little over a year before the rape of the plaintiff occurred. Defendant Johnson was aware of the dangers of homosexual rape at Jackson Prison. (For instance, he knew that a prisoner in the Jackson infirmary had been raped by an inmate nurse just months before the plaintiff was assaulted.) Yet defendant Johnson approved of the policies which contributed to the hazard of homosexual attacks such as the one the plaintiff suffered. For example, Johnson was responsible for the use of inmates as guards, the staffing of only one prison officer on a floor holding 37 inmates, the failure to train that officer in appropriate areas, the location of that officer's office half a football field away from those locked in the youthful offenders section, and the failure to orient arriving prisoners about prison security and the realities of prison life.

The defendants now move for a judgment notwithstanding the verdict, or in the alternative, for a new trial pursuant to F.R.C.P. 50(b) and 59. The defendants pos-

1. Section 1983 reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

tulate numerous grounds for vacating the jury's verdict, but these may be distilled into four main challenges:

1) The Court erred in its determination of the applicable law;

2) The evidence adduced neither supported the jury's verdict nor sustained the plaintiff's burden of making out a prima facie case;

3) The damage award was excessive;

4) Prejudicial evidence was improperly admitted.

## I. THE APPLICABLE LAW

■ The defendants argue at length in their brief about the legal standards which should have been applied in this case. Yet the defendants failed to complain of error in the jury instructions at trial, after being given ample opportunity to object. F.R. C.P. 51 mandates that

". . . No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Despite the unqualified language of F.R. C.P. 51, some courts maintain that failure to object will *not* preclude reversal "in exceptional cases . . . to prevent a clear miscarriage of justice", that is, where there is "plain error". *Nimrod v. Sylvester,* 369 F.2d 870, 873 (1st Cir. 1966). *Accord, O'Brien v. Willys Motors, Inc.,* 385 F.2d 163 (6th Cir. 1967) (judge gave no instruction on contributory negligence, a potentially decisive issue in the case).

The case at bar does not present the sort of extreme circumstances which may justify ignoring F.R.C.P. 51 and entertaining the defendants' contention that the verdict was "contrary to law". Counsel for the defendants approved of the instructions as proposed by the Court in chambers; counsel

then twice declined to make objections upon the Court's invitation after the instructions on the law had been read to the jury (plaintiff's counsel did register several objections at these times). Furthermore, the error alleged is not blatant or perverse. Since the defendants contest what are basically nuances or shadings in the Court's interpretation of an unsettled and murky area of the law, it is impossible to characterize any possible error here as "plain".

Nevertheless, because of the importance of the issues involved in § 1983 suits like the one at bar, this Court will address at some length the defendants' contention concerning the applicable legal standards.

### A. *Personal Involvement*

■ It is now settled that in § 1983 actions public officials cannot be held vicariously liable for the wrongdoing of others. *Monell v. N. Y. City Dept. of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Coffy v. Multi-County Narcotics Bureau, et al.,* 600 F.2d 570, at 580 (6th Cir. 1979) ("Liability under § 1983 may not be imposed upon an official simply on the basis of *respondeat superior.*"). So the defendants are correct when they assert that misconduct by subordinates or third parties cannot be imputed under § 1983 to an official who played no role in causing a deprivation of constitutional rights.[2]

The defendants would stretch this principle much farther, however, in an attempt to insulate public officials from § 1983 liability. The defendants suggest, that they could only be held responsible for the assault on the plaintiff if they had directly participated in the assault, for example, if they had been physically present when it occurred. If some other persons were the immediate cause of the plaintiff's injury then, the argument goes, the defendants could only be held liable if they induced those persons to carry out the assault by

---

2. The Court gave the jury the standard instruction on probable cause, as well as the following:

"I charge you that the mere happening of an assault or rape occurring in a prison does not create liability. Nor does the mere fact

that a prison official has supervision and control over a given area or a prison or system. There must be a degree of personal involvement that connects him to the claimed deprivation of a constitutional right."

directing, authorizing, or encouraging such conduct. According to this reasoning § 1983 precludes recovery against public officials where those officials indirectly contribute to a deprivation of constitutional rights by merely maintaining policies which lead to that deprivation.

■ These propositions are mistaken because, aside from the question of fault or state of mind (discussed below), § 1983 only requires that there be a *causal connection* between the official's conduct and the constitutional tort. *Monell, supra,* 436 U.S. at 792, 98 S.Ct. 2018; *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir. 1976). Section 1983, after all, plainly fixes liability on one who (under color of law) "subjects [a person], or causes [a person] to be subjected" to a deprivation of his constitutional rights. The statute does not add the qualification that only a defendant who is the immediate, direct, or precipitating cause of the plaintiff's injury will be held liable.

■ Section 1983 "should be read against the background of tort liability which makes a man responsible for the natural consequences of his actions". *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). Therefore it is misleading to frame the problem in terms of the extent of the defendants' involvement in the plaintiff's injury. All that must be shown on this score is that the defendants' conduct was a proximate cause of the plaintiff's injury.[3] It is true that under some circumstances an intervening cause may be so unforeseeable and the defendants' contribution so attenuated or remote that the defendants may be relieved of liability—but this is merely an application of tort principles of proximate cause. Thus, a claim under § 1983 is stated where it is alleged that the defendant "has personally subjected the plaintiff to a deprivation of his constitutional rights or has *caused the condition complained of or participated in some manner*". *Knipp v. Weikle,* 405 F.Supp. 782, 783 (N.D.Ohio 1975) (emphasis supplied).

■ Finally, the defendants advert to case authority for the proposition that supervisory officials cannot be found liable under § 1983 if their sole involvement in the deprivation of the plaintiff's rights consists of an alleged failure to train, supervise, or control their subordinates adequately. However, this generalized principle does not accurately reflect the case law. Most of the cases cited by the defendants stand for the rule that a *negligent* failure to oversee the conduct of subordinates does not state a claim under § 1983. *See Leite v. City of Providence,* 463 F.Supp. 585, 589–590 (D.R.I.1978). Inadequate supervision alone may be actionable, however, where the subordinate's abuses are so apparent that knowledge can be imputed to the supervisor, and the supervisor's failure to rectify the problem approaches recklessness. *Id.,* at 590. *See,* Developments: Section 1983 and Federalism. 90 Harv.L.Rev. 1133, 1207 (1977). Thus the question of inadequate supervision resolves itself into two issues: was there proximate cause, and was the supervisor sufficiently blameworthy? *See Leite, supra* at 588. If these queries are answered in the affirmative, failure to supervise is actionable. As the Supreme Court explained the personal participation requirement,

> "By our decision in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), we would seem to have decided that the mere right to control without any control or direction having been exercised and *without any failure to supervise* is not enough to support § 1983 liability." *Monell, supra,* 436 U.S. at 694, n. 58, 98 S.Ct. at 2037 (emphasis added).

**B.** *Single Incident as a Deprivation of Constitutional Rights*

The defendants contend that a single isolated incident, such as the assault in this case, cannot create § 1983 liability. Rather,

---

**3.** Again, this assumes that the other elements of a § 1983 action are present and that the defendant acted with the necessary degree of subjective culpability. See Subsection C of this Opinion.

the defendants assert, "a pattern of indisputed and unchecked violence" at the prison would have to be shown in order for the plaintiff to prove a violation of constitutional rights. *Penn v. Oliver,* 351 F.Supp. 1292, 1294 (E.D.Va.1972). The defendants mainly rely on *Penn v. Oliver* for support, but *Penn* expressly stated a narrower rule than the defendants ask this Court to apply. *Penn* allowed that in the absence of widespread violence, an "egregious failure to provide security to a particular inmate" *would* state a § 1983 cause of action. *Id.* The focus of *Penn* was on the culpability of the official's conduct, not simply the frequency or prevalence of attacks on inmates.

"An isolated act or omission by a prison official that allows an attack to occur and which involves only simple negligence does not, absent special circumstances, create a constitutional deprivation." *Id.*

■ Again, the defendants' broad contention misstates the law. The core question is whether the official's conduct evidenced an aggravated degree of fault, beyond "simple negligence". (See Subsection C below.) If the defendants' conduct is flagrantly culpable, then the mere failure to protect an inmate on a *single occasion* can constitute a deprivation of constitutional rights giving rise to a claim under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Parker v. McKeithen,* 488 F.2d 553 (5th Cir. 1974); *Curtis v. Everette,* 489 F.2d 516 (3rd Cir. 1973); *Fitzke v. Shappell,* 468 F.2d 1072 (6th Cir. 1972) (medical neglect). The import of pervasive prison violence is that such circumstances would be a basis to infer knowledge, and thus culpability, on the part of a defendant prison official. In addition, some of the cases which emphasize that only widespread attacks amount to violations of

the Eighth Amendment are actions for injunctive relief, where the focus is on general conditions rather than individual injury. E. g., *Hite v. Leeke,* 564 F.2d 670 (4th Cir. 1977).

### C. *Fault*

■ The defendants contend that the plaintiff cannot recover under § 1983 in the absence of a showing that the defendants acted with an intent to harm the plaintiff or with similar improper motives.

The most significant authority on this point of law is the case of *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), where the Supreme Court directly addressed the issue of fault in § 1983 actions for alleged deprivations of Eighth Amendment rights. *Estelle* involved a prisoner's damage action against public officials based on inadequate medical treatment. The Court held that to state a cause of action for deprivation of the right to be free from cruel and unusual punishment a plaintiff must allege more than negligence; the "prisoner must allege acts and omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292.

This "deliberate indifference" standard of *Estelle v. Gamble* is clearly applicable to the case at bar since the neglect of serious medical needs in *Estelle* is analogous to the neglect of serious needs for physical protection. The difficulty arises in formulating a concrete definition of the cryptic phrase, "deliberate indifference". More specifically, the question is whether, by the use of the qualifier "deliberate", the Supreme Court meant that only intentional harm would impinge upon a person's rights under the Eighth Amendment.[4]

---

4. It is not entirely certain what import *Estelle v. Gamble's* deliberate indifference standard has for § 1983 actions based on deprivations of rights other than Eighth Amendment rights. It is possible that regardless of what constitutional right is alleged to have been violated, liability under § 1983 will only be imposed where the defendant violated that right with deliberate indifference. *See* Chief Justice Burger's dissenting opinion in *Procunier v. Navarette,* 434

U.S. 555, 566–568, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). But *Estelle v. Gamble* seemed to limit the required showing of deliberate indifference to cases where cruel and unusual punishment was alleged.

This problem is essentially academic in the present case, since here there are allegations of cruel and unusual punishment. Some complication arises from plaintiff's additional allegation that he was deprived of his substantive

The Supreme Court in *Estelle* simply suggested that "[D]eliberate indifference . . constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Id.*, at 104, 97 S.Ct. at 291, quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). "Wanton", of course, is a legal term of art. The standard definition of a wanton act is "one done in reckless or callous disregard of, or indifference to, the rights of one or more persons". 3 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 85.11. "Ill will is not a necessary element of a wanton act . . ." *Black's Law Dictionary* (Fourth Ed. 1968) at 1753. Thus the Supreme Court cast its standard in terms denoting a species of recklessness or callous neglect. If the Court had desired to limit its test to intentional or malicious actions it easily could have done so, instead of announcing the "deliberate indifference" test.

Although the Court has cast no further light on the meaning of deliberate indifference, Chief Justice Burger has indicated that the phrase may encompass reckless conduct. In *Procunier v. Navarette* (another § 1983 action against prison officials), he said:

> "I would hold that one who does not intend to cause and does not exhibit deliberate indifference to the risk of causing the harm that gives rise to the constitutional claim is not liable for damages under § 1983."
>
> 434 U.S. 555, 568, 98 S.Ct. 855, 863, 55 L.Ed.2d 24 (1978) (Burger, C. J., dissenting).

The implication is that deliberate indifference, as the Chief Justice understands the term, is something other than intentional conduct; deliberate indifference may involve taking risks, rather than intending results.

There is support for this interpretation in decisions from a number of other courts. In *Westlake v. Lucas* (cited by the Supreme Court in *Estelle*, *supra*, 429 U.S. at 105, n. 11, 97 S.Ct. 285), the Sixth Circuit held that "deliberate indifference" to an inmate's physical suffering was actionable under § 1983. 537 F.2d 857 (6th Cir. 1976). The Court of Appeals explained, "A complaint need not allege that prison officials consciously sought to inflict pain on a prisoner by withholding treatment." *Id.* at 860, n. 3. *Little v. Walker*, 552 F.2d 193 (7th Cir. 1977) involved a prisoner's § 1983 suit for failure to protect him from inmate assaults. The Seventh Circuit read *Estelle v. Gamble* to hold that,

> "While mere inadvertence or negligence cannot support a Section 1983 action raising Eighth Amendment issues, deliberate indifference '[r]egardless of how evidenced'—*either by actual intent or recklessness*—will provide a sufficient foundation."
>
> 552 F.2d at 198, n. 8 (emphasis supplied).

In *Leite v. City of Providence*, a case concerning alleged police brutality, the District Court concluded that *Estelle's* "standard of 'deliberate indifference' is in accord with lower federal courts that hold 'wanton', 'reckless', or 'grossly negligent' conduct by state officials actionable under section 1983." 463 F.Supp. 585, 590 (1978). *See also, Goodman v. Parwatikar*, 570 F.2d 801,

due process rights (under the Fourteenth Amendment). Yet *Estelle v. Gamble* defined cruel and unusual punishment in terms strongly reminiscent of substantive due process. The Court said that the Eighth Amendment:

"embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ,' against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' . . . or which 'involve the unnecessary and wan-

ton infliction of pain' . . . ." 429 U.S. at 102–103, 97 S.Ct. at 290 (Citations omitted). Quoting *Palko v. Connecticut*, 302 U.S. 319, 323, 58 S.Ct. 149, 82 L.Ed. 288 (1937), the Court asked whether the manner of plaintiff's injury was "repugnant to the conscience of mankind". *Id.* 429 U.S. at 106, 97 S.Ct. at 292.

Since *Estelle* defined Eighth Amendment rights by reference to substantive due process rights, this Court assumes that both constitutional guarantees allegedly abrogated in this case require the same showing of deliberate indifference.

805 (8th Cir. 1978). (*Estelle* authorizes recovery in mental patient's § 1983 suit for inadequate treatment if plaintiff establishes "wanton disregard of duty by defendants").[5]

The defendants in the case at bar argue that even if this Court has properly construed *Estelle v. Gamble*, the Court erred by failing to instruct the jury on the defendants' official immunity; the defense of official immunity, they assert, may preclude recovery against public officials even if these officials acted with deliberate indifference to plaintiff's serious needs or rights.

■ It is true that public officials retain some portion of their common-law qualified immunity from suit in § 1983 cases. *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), see, Developments—Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1210 (1977). In addition, this qualified immunity inures to state prison officials. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (First Amendment rights). Unfortunately the Supreme Court has not yet considered the doctrine of qualified immunity in the context of an alleged deprivation of Eighth Amendment rights.[6] Yet the Supreme Court has held that the qualified official immunity defense may be unavailing to a defendant who did not intentionally deprive the plaintiff of his rights, if the defendant's conduct was unreasonable; in other words, subjective good faith alone will not excuse an official from liability. *Wood v. Strickland,* 420 U.S. 308, 314, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The Court explained that,

". . . *however worded,* the immunity must be such that . . . officials understand that action taken in good-faith, fulfillment of their responsibilities and *within the bounds of reason under all the circumstances* will not be punished . . . ."

420 U.S. at 321, 95 S.Ct. at 1000 (emphasis supplied). *See also Scheuer v. Rhodes,* 416 U.S. 232, 247–248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ Since deliberate indifference is by definition outside the bounds of reasonable good faith behavior, once a plaintiff has shown that the defendants acted with deliberate indifference to his serious need for personal safety then qualified official immunity provides no further obstacle to recovery.[7] So it appears there was no need in the case at bar to instruct the jury on the details of defendants' qualified immunity since the Court did instruct the jury that only deliberate indifference or callous neglect by the defendants could warrant a verdict against them. Nevertheless, in an excess of caution, the Court recited to the jury the principles that form the basis of the official immunity doctrine and admonished the jury against cavalierly imposing liability on public officials. The instructions, "however worded", conveyed the gist of the doctrine.

■ Taken as a whole the instructions adequately advised the jury of the sort of egregious official misconduct which a plaintiff must show to recover against state offi-

---

**5.** These cases interpret *Estelle v. Gamble* to hold that even that variety of recklessness based on imputed knowledge would constitute deliberate indifference. The Court in *Little v. Walker* held that even if they were not actually conscious of the serious danger their conduct posed to others, the defendants would be liable if a reasonable person would have been aware of the plaintiff's peril. 552 F.2d 193, 197–198, n. 8 (7th Cir. 1977). *Accord, Leite v. City of Providence,* 463 F.Supp. 585, 591 (1978) ("imputed knowledge" actionable).

In contrast, the jury in the case at bar was instructed that the defendants could only be held liable for reckless disregard of the plaintiff's health or safety if the defendants *actually* were aware of the serious risk of harm to the plaintiff.

**6.** In *Estelle v. Gamble,* the Court did not reach the official immunity defense since the Court held that no § 1983 claim of an Eighth Amendment deprivation had been stated where there were no allegations of deliberate indifference.

**7.** Other courts have reached the same conclusion. In both *Leite v. City of Providence, supra,* and *Little v. Walker, supra,* the courts indicated that a showing of *Estelle v. Gamble* deliberate indifference would overcome the qualified immunity defense.

**1120**

cials in a § 1983 action based on cruel and unusual punishment.[8]

## II. THE EVIDENCE AT TRIAL

A new trial may be ordered where the verdict is against the clear weight of the evidence. *Duncan v. Duncan,* 377 F.2d 49 (6th Cir. 1967). However,

> "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & P. U. Ry. Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944).

*Accord, Process Control Corp. v. Tullahoma Hot Mix Paving Company, Inc.,* 79 F.R.D. 223, 226 (E.D.Tenn.1977). Furthermore, when considering defendants' motions like the ones at bar, the evidence and reasonable inferences therefrom must be viewed in the light most favorable to the plaintiff. *E. g., Miller v. Cincinnati, New Orleans and Texas Pacific Railway,* 203 F.Supp. 107 (E.D. Tenn.1962), *affirmed* 317 F.2d 693 (6th Cir. 1963).

The critical issues at trial involved two elements of the defendants' culpability: (1) actual awareness of a serious risk of harm to the plaintiff, and (2) failure to take the steps a reasonable person with that knowledge would have taken to eliminate the danger.

### A. *Defendant Johnson's Knowledge and Responses*

Although defendant Johnson was the Director of the state Department of Corrections at the time the plaintiff was raped in prison, Johnson had been warden of that prison as recently as one year prior to the rape. This important fact permitted the jury to doubt Johnson's avowals of ignorance based on his remote position as a high-level administrator. The evidence showed in particular that Johnson had clearly been alerted to the problems of homosexual rape at the prison by a confidential State Police Report, by a meeting with Judge Britton (a Circuit Court Judge who had received many complaints regarding homosexuality at the prison which was within his jurisdiction), by the news stories of Judge Britton's revelations, and by his own experience. Johnson's awareness of the severity, dimensions, and details of the homosexual rape peril of those in the plaintiff's circumstances was also evidenced by his admissions on the stand: he knew, for instance, that inmate nurses were a poor

8. The jury was instructed that:

"... in order to find fault or liability on the part of a defendant, you must find that he acted, or failed to act, with deliberate indifference or callous neglect. This means that before either of the defendants can be found liable you must find that he was aware or knew of an unreasonable, serious risk of harm to the plaintiff and that the defendant failed to take the steps a reasonable person in his position would have taken to eliminate the danger, taking into consideration all of the circumstances in this case.

"In considering whether either of the defendants knew of an unjustifiable danger to Mr. Redmond, you may consider all evidence and make the inferences you deem proper as to the defendants' knowledge. Should you find that the danger posed to Mr. Redmond was obvious and undisputable, or evident and serious, you may take that into account in determining whether it would have come to the attention of someone in the position of either of the defendants.

"By way of further explanation of this element and the duty I have defined, I charge

you that the mere happening of an assault or rape occurring in a prison does not create liability. Nor does the mere fact that a prison official has supervision and control over a given area or a prison or system. There must be a degree of personal involvement that connects him to the claimed deprivation of a constitutional right.

"The law recognizes also that public officials cannot lightly be held liable in damages for injuries that may be caused in the performance of their duties since it is important to the public that such officials be permitted to carry out their public duties without a constant fear of lawsuits and having to respond in damages. As a result the law says that public officials cannot be held liable for *constitutional injuries which result from* mere errors of judgment, inadvertence or carelessness. That is the reason then that the degree of fault as I advised you must amount to deliberate indifference or callous neglect as I have defined those terms for you."

method of protecting inmates from assaults, that young, slight and fair individuals like the plaintiff were prime candidates for rape, that the layout of the infirmary where the rape occurred put the screened-off youth section an appreciable distance from the supervisor's office, and that a rape of another inmate had occurred at the infirmary several months prior to the plaintiff's rape.

The evidence also amply supported the inference that Johnson's responses were wholly inadequate. Recklessness could be inferred from Johnson's continued reliance on inmates as guards; his failure to make certain that nurses were trained in custodial techniques, his failure to post even one full-time non-inmate guard on the floor, and his failure to make certain that new prisoners like the plaintiff were oriented to prison realities. The jury was particularly justified in relying on the uncontroverted and unshaken testimony of plaintiff's expert, Dr. Fogel, a former director of the Minnesota Department of Corrections and the current head of the Criminal Justice facility at a university. Dr. Fogel convincingly testified that Johnson's procedures amounted to what he called a "terribly negligent", unjustified failure to correct a known, dangerous situation.

### B. *Defendant Baxley's Knowledge and Responses*

Defendant Baxley, the nurse-supervisor on duty during the rape and attacks on the plaintiff, did not deny on the stand that he heard the plaintiff's plea for help. He said he could not remember the incident very well. The plaintiff's testimony that he shouted, supported by the eyewitness Clay's testimony to the same effect, was sufficient for the jury to conclude that Baxley was aware of probable danger to the plaintiff. Baxley argues that, since he was immersed in paper work at the time, he reacted reasonably by dispatching an inmate nurse to investigate the plaintiff's call for help. Yet according to the eyewitness, Clay, defendant Baxley responded to the plaintiff's call with the reply: "You got your ass in here, now you take care of it". This evidence of deliberate indifference or callous neglect, combined with evidence that Baxley knew of the danger of homosexual rape and inexplicably delayed reporting the incident in question, was enough to justify the jury's verdict.

In sum, the verdict was supported by the clear weight of the evidence. Therefore, neither a new trial nor a judgment notwithstanding the verdict may be obtained on this ground.

### III. EXCESSIVENESS OF DAMAGE AWARD

The jury awarded the plaintiff $130,000. The defendants argue that this sum is exorbitant because most of the harm and suffering to the plaintiff resulted not from the rape but from the plaintiff's pre-existing diabetic and emotional problems.

At trial, the defendants did not offer rebuttal evidence on the issue of damages; nor did they bring forth experts of their own to contradict the plaintiff's proofs. Thus the uncontroverted testimony of the plaintiff revealed that he suffered pain, bloody stools, loss of some teeth, lingering bowel pains, and a chronic diabetic leg ulcer as a result of the rape attack. Moreover, the plaintiff's expert witness, Dr. Peeples, gave thorough, detailed testimony as to the traumatic effects the rape had on the plaintiff. Far from having to speculate or imagine the damage done by the rape, the jury was given a detached, scientific analysis of the severe personality changes wrought by the rape. Dr. Peeples testified, for example, that the plaintiff was depressed, suffered rape flashbacks, could not develop friendships, perceived himself as a woman, and seemed unable to have relationships with women. Finally, the uncontradicted expert testimony was that these emotional disturbances resulted primarily from the rape, not from any pre-existing disease or from prior psychological maladjustment.

Although this Court may quibble with the precise amount of the jury award the Court can only order a new trial where the recovery is so unwarranted, giv-

en the plaintiff's injuries, that the jury award shocks the conscience, or where there is reason to believe that the award resulted from passion, prejudice, or partiality.[9] E. g., *White Motor Corp. v. Stewart*, 465 F.2d 1085 (10th Cir. 1972); *Haidy v. Szandzik*, 46 Mich.App. 552, 208 N.W.2d 559 (1973). Since the well-qualified and believable expert witness for the plaintiff gave the jury evidence of significant harm resulting from the rape, since the defendants did not counter this evidence or provide a plausible evidentiary basis for finding that there was some other cause of the plaintiff's troubles, and since the defendants can point to no real instances of improper influence, the jury's damage award must stand.

## IV. IMPROPER ADMISSION OF EVIDENCE

First the defendants contend that the jury should not have been allowed to hear Dr. Peeples' opinion testimony concerning the medical complications resulting from the rape. According to the defendants, Dr. Peeples, who is not a medical doctor, stepped outside the realm of his expertise when he gave that testimony.

The defendants did not object when the plaintiff moved to qualify Dr. Peeples as an expert in his field, medical behavioral science. His credentials as a member of the medical faculty at the University of Virginia were impeccable. As a medical behavioral scientist Dr. Peeples perhaps would not have been qualified to testify about diagnosing or treating an illness, but he was as qualified as anyone to discuss the links between trauma (the rape in this case) and its medical complications (whether physiological, psychological, or behavioral).

■ Since it was demonstrated that Dr. Peeples was among those persons most qualified to testify about the medical ramifications of rape trauma, the Court did not

abuse its broad discretion to admit expert evidence. *Salem v. U. S. Lines*, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). If they wished to challenge the validity of medical behavioral science or to impugn the worth of Dr. Peeples' opinions, the defendants had the opportunity to present experts of their own, even medical doctors, (which they declined to do) and to attack the witness on cross-examination.[10]

■ The defendants also complain that hearsay evidence was improperly admitted when the Court admitted portions of a State Police Report on sexual assaults in state prisons.[11] The Court allowed this evidence for the limited non-hearsay purpose of showing the state of mind and the knowledge of the defendant Perry Johnson. The defendants say, however, that opposing counsel constantly referred to the report for the truth of the statements contained therein, and thus the jury was influenced to use the evidence for an impermissible purpose.

The Court did give a limiting instruction to the jury when the report was admitted. The Court is not aware of any occasion when the defendants objected to the plaintiff's misuse of the evidence without an additional limiting instruction being given to the jury. Furthermore, the defendants have neglected the possibility that the state police report may be admissible for the truth of what it asserts under hearsay exception 803(8)(C) for "public records and reports". This rule admits for their truth

> "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . .
>
> "(c) . . . factual findings resulting from an investigation made pursuant to authority granted by law . . . ."

The fact that the report was characterized as "confidential" by the state is irrelevant to the general question of any hearsay problem with the Report and in particular irrelevant under the language of 803(8).

**9.** The defendants do not ask for remittitur.

**10.** It appears that the defense did not even utilize any discovery tools regarding the qualifications and proposed testimony of Dr. Peeples, and for that matter, of Dr. Fogel.

**11.** This report was the subject of much debate in the pre-trial process. The Court after viewing it *in camera* provided the plaintiff with portions of it for the reasons set forth in its Memorandum Opinion and Order on file.

Finally, the defendants argue that a letter from the plaintiff to the defendant Johnson was self-serving, prejudicial hearsay and should not have been admitted. The letter to Johnson when he was prison warden complained of the rape a few days after it occurred. Of course if the letter was offered to prove that the rape had occurred, it would be hearsay; but if it was offered for a non-hearsay purpose, for instance, to rehabilitate a witness, then its admission would not contravene the hearsay rule.

F.R.E. 801(d)(1)(B) specifically defines certain out-of-court prior consistent statements as non-hearsay. This rule sanctions the admission of the prior consistent statement when it is offered to "rebut an express or implied charge against [the witness] of recent fabrication or improper influence or motive . . ." Often the impeachment evidence which opens the door to rehabilitation under 801(d)(1)(B) consists of evidence that the witness did not speak of the matter previously when he had an opportunity to do so. 4 Wigmore on Evidence § 1129 (1972).

In the case at bar the defendants suggested and argued that the rape incident never occurred, as evidenced by the fact that the defendant did not report the rape to the authorities. This constituted an implied accusation that the plaintiff fabricated his story of the rape. Thus, under 801(d)(1)(B) it was proper to admit the letter he wrote to the warden a few days after the rape since the letter tended to show that his story had not been invented later.

Additionally, if the admission of the letter was error, it was most likely harmless. The letter was not a critical building block in the plaintiff's case and the jury had a great deal of other evidence on which to base the verdict.

The defendants' Motions for Judgment Notwithstanding the Verdict or for a New Trial are DENIED.

IT IS SO ORDERED.