Chester VAUGHN et al.

v.

Paul TROTTER et al.

No. 77–3482–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

Oct. 16, 1980.

See also 516 F.Supp. 902.

Gordon Bonnyman, Legal Services of Middle Tennessee, Inc., Nashville, Tenn., for plaintiffs.

William Leech, Atty. Gen., for the State of Tenn., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

This action was filed on October 4, 1977, by three prisoners at the Tennessee State Penitentiary in Nashville, Tennessee. Their *pro se* complaint alleged that they were being harassed and/or punished by the defendant prison officials who were allegedly attempting to obstruct the plaintiffs' constitutionally protected right of access to the courts. The plaintiffs sought damages pursuant to 42 U.S.C. § 1983 for violations of their rights under the first and fourteenth amendments to the Constitution. The court has determined that it has jurisdiction to ascertain the merits of the plaintiffs' cause under 28 U.S.C. § 1343.

The three plaintiffs are all former inmates of the Tennessee State Prison in Nashville. Plaintiff Chester Vaughn was incarcerated at Tennessee State Prison from January 26, 1977, until February 7, 1978; again from August 1 to August 19, 1978; and finally from January 17, 1979, until his release from the Tennessee prison system on April 10, 1980.[1] During the period in 1977 and 1978 when he was at the prison in Nashville, he worked actively as a "jailhouse lawyer," preparing petitions, letters and legal documents for himself and other prisoners in an array of civil and criminal proceedings. Plaintiff George Gregg, who is now confined at Brushy Mountain Prison in Petros, Tennessee, was incarcerated in the Tennessee State Prison at Nashville from the summer of 1976 until sometime in June of 1978. He is illiterate, and in 1977 he sought legal assistance from Chester Vaughn in an attempt to set aside his criminal conviction. Plaintiff Albert Holman, who is currently confined at De-Berry Correctional Institute in Nashville, a correctional institution for mentally handicapped prisoners, was incarcerated in Tennessee State Prison during parts of the

---

1. The stipulations inaccurately reflected a release date of April 11, 1980. The error was corrected during the plaintiff Vaughn's testimony at trial.

years 1977 and 1978. He also sought legal assistance from plaintiff Vaughn in an attempt to challenge his conviction.

Defendant Vinson Thompson was warden at the Tennessee State Prison from January 1976 until February 1979. Defendant John Griggs is now, as he was through 1977 and 1978, a lieutenant at the Tennessee State Prison assigned to the position of internal affairs officer. In that capacity, Lieutenant Griggs has responsibility for investigating criminal violations and infractions of institutional rules by prisoners and staff at Tennessee State Prison. Defendant Paul Trotter is a sergeant of the guard force of the Tennessee State Prison. In 1977 and 1978 he held the rank of corporal and worked in the Operations office at the Tennessee State Prison, where his duties included the notarization of prisoners' legal documents. Defendant Douglas Cluck was employed in the fall of 1977 as staff attorney for the Tennessee Department of Correction, and in that capacity was called upon from time to time to give advice to departmental staff, including the other defendants in this action.

The original complaint centered around an incident which was alleged to have occurred at the business window of that portion of the prison known as "Operations" where notarial services are provided. On September 8, 1977, Vaughn accompanied Holman to Operations to have a power of attorney notarized which would authorize the release of "data, documents or facts from person or agency" to Vaughn. This information was restricted to that which related to Holman's second degree murder conviction which Vaughn was working on in his capacity as law clerk at the prison. *See* defendants' exhibit D-2. After some delay, defendant Trotter reluctantly notarized the document.

The following day, Vaughn attempted to repeat the procedure with plaintiff Gregg. This time Trotter took the papers and telephoned the staff attorney, Douglas Cluck. Cluck advised Trotter to hold the papers and not to notarize them at that time. Trotter subsequently advised both Holman and Gregg that they did not need Vaughn to file suits for them and, moreover, that the limited power of attorney could permit Vaughn to gain access to their prison accounts and take any funds therein. The papers which were taken by Trotter were eventually returned, but there was testimony that two copies thereof were not returned and that the papers were held for over a month.

Vaughn charged that Trotter and others conformed to a policy of harassment and delay in notarizing documents on behalf of Holman and Gregg and that therefore the constitutional rights of these two plaintiffs were violated in and by the foregoing episode. Vaughn alleged that this act and numerous others infringed upon his own rights as well as his ability to serve as a jailhouse lawyer for others. This latter contention will be more fully developed, *infra.*

The case was tried without a jury on April 17 and 24, 1980.

At the outset it must be stated that it is the determination of the court that defendant Cluck must be exonerated from any personal responsibility or liability for any of the matters presented here. He acted only on information supplied by other defendants, and he did not render any advice which would have countenanced harassment or invidious treatment of any of the plaintiffs. On the contrary, he repeatedly advised state officials of their responsibilities under the various decisions of the Supreme Court and of this court. Accordingly, judgment will be entered in favor of defendant Cluck.

*Plaintiff Holman*

At the time of trial, Holman was hospitalized at an institution for mentally handicapped prisoners. It was apparent to the court that Holman was intellectually impaired and that he had difficulty understanding and answering questions by counsel and the court. He also stated that he was taking medication for his nerves. In addition, he recalled little of the events of the fall of 1977.

Nevertheless, this plaintiff testified that he did utilize the services of Chester Vaughn to assist with legal problems because he (Holman) had no money for a lawyer. Holman stated that, although he could read, he often did not understand the papers that Vaughn would prepare, but Vaughn would explain them and Holman would sign them. Holman does not remember a power of attorney but identified his signature on exhibit D–2. Holman also testified that defendant Griggs advised him not to use Vaughn as a jailhouse lawyer because Griggs was afraid that Vaughn would take money from Holman's prison account.

This plaintiff further testified that Trotter never refused to notarize papers for him, nor did Trotter ever seize any papers and refuse to return them. This plaintiff also stated affirmatively that Griggs never discouraged law suits or any legal attempts on behalf of this plaintiff. There was no evidence presented that Vinson Thompson interfered with this plaintiff's right of access to the courts. Accordingly, as for plaintiff Holman, judgment is entered in favor of each of the defendants.

*Plaintiff Gregg*

The testimony of Gregg concerning his involvement in the September 9, 1977, incident was that the power of attorney was drafted so that Chester Vaughn might obtain various papers from Gregg's former attorney in the hope of getting Gregg's case back in court. Gregg stated that Trotter did not notarize them and kept the papers for "a few days." Thereafter, Trotter returned one copy of three duplicate sets and advised Gregg that the power of attorney would permit Vaughn to take everything Gregg had. Because Gregg was illiterate, Vaughn would act as his jailhouse lawyer, explain papers to Gregg, and submit them on his behalf. Gregg testified that Trotter notarized a number of papers for him, and apparently the power of attorney was the only document which was not notarized. Further, Gregg stated that he did not complain to Trotter about the failure to return two copies of the documents aforemen-tioned. Gregg testified that he really did not know what this suit is about and that he believed that the matter had been dropped long ago. This plaintiff further stated that because of the three-year interval, his memory was such that he does not now recall the truth of his original accusations.

On the basis of the record, the court holds that plaintiff Gregg has failed in his effort to prove a violation of his constitutional rights, and judgment will accordingly be entered for each defendant as to this plaintiff.

*Plaintiff Vaughn*

The allegations of plaintiff Vaughn and the proof in support thereof are more serious. Before fully examining the pervasive scope of harassment and impediments to reaching the courthouse which Vaughn has alleged, the September 9, 1977, incident will be dealt with since this is the only direct link between Vaughn and defendants Griggs and Trotter. It will not be forgotten, however, that the circumstances must be viewed in their totality; not seriatim or piecemeal. *Cf. Russell v. Oliver*, 552 F.2d 115 (4th Cir. 1977) (allegations of harassment as a result of exercise of right of access to the courts should be considered as a unit and not as isolated incidents).

The defendant Griggs is not shown by the record to have directly attempted to punish or harass Vaughn. It is argued, however, that statements which Griggs made to Holman had potentially serious implications for Vaughn. Griggs advised Holman that the power of attorney would give Vaughn access to Holman's prison bank account. At the least, such a statement could have deterred Holman from seeking legal assistance from Vaughn, the plaintiff argues, and it also had the potential for fostering a reputation for Vaughn which would deter the prison population in general from seeking Vaughn's aid. However, there was no evidence proffered that this result occurred, and the court will not speculate. On the record adduced, it cannot be said that defendant Griggs, through his statement as to the possible effects of the

power of attorney, violated the civil rights of plaintiff Vaughn. Accordingly, a judgment in favor of defendant Griggs will be entered.

■ As for defendant Trotter, the court dismissed the plaintiffs' claims concerning notary services on the basis that there were no allegations that such services were either permanently denied or prejudicially delayed. The plaintiff Vaughn does argue, however, that Trotter's denial of notarization in the September 9, 1977, incident was a significant contribution in an overall pattern of harassment against Vaughn for his legal activities. There is not, however, sufficient evidence in the record to so conclude. It is true that on September 8, 1977, Trotter did notarize a power of attorney between Holman and Vaughn, and the following day he refused to do so on the power of attorney between Gregg and Vaughn. The court is aware, too, of the fact that seemingly minor incidents take on a significance of magnified proportions in the confines of a prison environment. Nevertheless, Trotter was seeking the advice of counsel in the matter; his concern was not unreasonable; and it appears that he may well have had the best interests of Gregg in mind when making his refusal. It would, therefore, be improper for the court to find that Vaughn's constitutional rights were violated by Trotter's conduct on September 9, 1977. Judgment will be entered for defendant Trotter.

Thus far, the court has been focusing upon the September 9, 1977, incident with regard to the three plaintiffs and the four defendants. The record contains, however, a great deal of evidence of a pervasive and continuing pattern of harassment with regard to plaintiff Vaughn in apparent retaliation for his activities as a jailhouse lawyer.

■ The court begins its examination of these events secure in the knowledge that prisoners have a constitutional right to meaningful access to the courts which a state may not abridge or impair, nor may it impermissibly burden its exercise. *Bounds v. Smith*, 430 U.S. 817, 823–24, 97 S.Ct. 1491, 1495–96, 52 L.Ed.2d 72, 80 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

Much of the evidence which follows deals with retaliation not only for Vaughn's legal efforts in his own behalf, but also his activities as a jailhouse lawyer for others. The court takes judicial notice of its own files which contain a number of very credible petitions of which Vaughn was the scribner. In addition, Vaughn's uncontroverted testimony at trial indicated that he filed some 150 "writs" [2] on behalf of others. [3] The defendants maintain that, while prisoners have the right of mutual assistance in legal matters as established in *Johnson v. Avery, supra*, a prisoner has no constitutional right to handle a lawsuit on behalf of another prisoner. For this proposition the defendants cite *McKinney v. DeBord*, 324 F.Supp. 928 (E.D.Cal.1970), to which the court takes the liberty of adding the subsequent history, *aff'd in part, rev'd in part*, 507 F.2d 501 (9th Cir. 1974). The case does not so state. That court finds only that "[t]here is no constitutional right for inmates at different institutions to correspond, whether on legal matters or otherwise." 324 F.Supp. at 932.

The rule of *Johnson v. Avery*, that inmates have a right of mutual assistance in legal matters, in the absence of other alternatives, [4] is a clear one. That case does not

2. All petitions, complaints, and the like are generally referred to by the prison population as "writs." Consequently, jailhouse lawyers are frequently termed "writ writers."

3. During 1977–78, the population in the Penitentiary numbered approximately 2,500. The court would note in passing where only two inmates were assigned to serve as Inmate (legal) Advisor for a prison population of 1,321, a court termed it "far from adequate to serve all

of the reasonable needs of the inmates." *Taylor v. Perini*, 413 F.Supp. 189, 203 (N.D.Ohio 1976).

4. The defendants at no time asserted that there was a reasonable alternative to inmate mutual assistance, and, even if they had, the burden would have been upon them to prove both that an alternative existed and that it was reasonable. *Novak v. Beto*, 453 F.2d 661, 664 (5th Cir. 1971), *cert. denied sub nom. Sellars v. Beto*,

hold that an inmate merely has a right to receive legal assistance. Rather, the right is mutual; it is the right to give as well as to receive, for the latter is not possible without the former.

*Johnson v. Avery* flows directly from a well-established line of cases thought to have had their genesis in *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). These cases establish beyond peradventure the right of reasonable access to the courts. Although not specifically mentioned in the constitution, the right of court access is based upon the first and fourteenth amendment right to petition all branches of government for a redress of grievances; on the fifth and fourteenth amendment guarantees of due process and equal protection of the law; and on the sixth and fourteenth amendment right to counsel. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). *See also, Cochran v. Kansas*, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453 (1942).

█ The right of mutual assistance among inmates, as it pertains to legal matters, is ultimately to protect and guarantee access to the courts, especially for the blind, illiterate, mentally handicapped, and the like. *Johnson v. Avery, supra.* At the district court level in *Johnson v. Avery*, the

court, per Miller, J., observed that "[f]or all practical purposes, if such prisoners cannot have the assistance of a 'jail-house lawyer,' their possibly valid constitutional claims will never be heard in any court." 252 F.Supp. at 784.

But this leaves unanswered to whom the right belongs and also the scope of its protection. The court begins its examination with the observation that in *Johnson*, the district court and ultimately the Supreme Court invalidated a prison restriction which prohibited one inmate from assisting another inmate in legal matters.[5] The Supreme Court struck down the regulation and held that, absent reasonable alternatives, inmates could not be barred from furnishing legal assistance to other inmates. 393 U.S. at 490, 89 S.Ct. at 751, 21 L.Ed.2d at 724. The Court noted that the "federally protected" right to assist other inmates could not be abrogated under the guise of the state controlling the practice of law.[6] 393 U.S. at 490 n. 11, 89 S.Ct. at 751 n. 11, 21 L.Ed.2d at 724 n. 11.

In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held unconstitutional a rule prohibiting inmates *giving to* or receiving from other inmates legal assistance on civil matters unless the prison or its officials provide a "reasonable alternative."

*Corpus v. Estelle*, 551 F.2d 68, 70 (5th Cir. 1977) (emphasis added).[7] Logic demands

---

409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972). Therefore there is no question in this case as to whether mutual inmate assistance was constitutionally required during the period in question—it was.

5. The regulation provided: "No inmate will advise, assist or otherwise contract to aid another, either with or without a fee, to prepare Writs or other legal matters. It is not intended that an innocent man be punished. When a man believes he is unlawfully held or illegally convicted, he should prepare a brief or state his complaint in letter form and address it to his lawyer or a judge. A formal Writ is not necessary to receive a hearing. False charges or untrue complaints may be punished. Inmates are forbidden to set themselves up as practitioners for the purpose of promoting a business

of writing Writs." 393 U.S. at 484, 89 S.Ct. at 748, 21 L.Ed.2d at 720.

6. There is no question, however, that not only can courts discipline and disbar unethical lawyers in the civilian world, they can exercise power with respect to unethical and irresponsible inmates of the prisons who purport to provide legal representation to other inmates. *Matter of Green*, 586 F.2d 1247, 1251 (8th Cir. 1978), *cert. denied*, 440 U.S. 922, 99 S.Ct. 1249, 59 L.Ed.2d 475 (1979).

7. There it was determined that, even where a department of corrections employs staff attorneys for the specific purpose of filing habeas corpus petitions and various civil complaints on behalf of inmates, mutual inmate assistance is constitutionally required. *Corpus v. Estelle*,

that if inmate mutual assistance is constitutionally required, the state, through its agents, may not harass, intimidate, or otherwise interfere with those inmates who have undertaken to provide legal assistance to other inmates. "[I]t is clear that the right to receive legal aid would be empty if correctional authorities were free to punish its donation. Thus, in order to protect the right of the donee to legal help, the donor threatened with punishment for providing legal assistance must be permitted to assert the donee's right." *Nickl v. Schmidt*, 351 F.Supp. 385, 389 (W.D.Wis.1972) (on the issue of standing).

In guaranteeing the right of mutual inmate assistance in order to assure access to the courts, the Supreme Court has created a derivative right, vested in jailhouse lawyers, to provide legal assistance to others. The clear right to receive assistance necessarily creates the concomitant right to provide it. It has been held to be fundamental that "absent reasonable alternatives, and subject only to reasonable restrictions, inmates must be allowed to assist other prisoners in the preparation of legal petitions." *Bryan v. Werner*, 516 F.2d 233, 236 (3d Cir. 1975). Punishment or harassment of jailhouse lawyers aimed at deterring their work is not constitutionally permitted. *McCray v. Bennett*, 467 F.Supp. 187, 196 (M.D.Ala.1978). To persecute the jailhouse lawyer ultimately threatens, both directly and indirectly, those for whom the rule of mutual assistance was primarily intended, i. e., the blind, the illiterate, the mentally handicapped, etc. Therefore, the court rules that the state could not constitutionally harass, punish or intimidate Vaughn because of his efforts to assist inmates in gaining reasonable and meaningful access to the courts.

In addition, the court notes that the State of Tennessee in fact appointed Vaughn to one of two [8] law clerk positions,

the object of which was to assist in law-related activities. The defendants, in their answer to interrogatories *and* in their pretrial order, denied that Vaughn was appointed as a law clerk. At trial, the ex-warden testified that he did not remember but that Vaughn "might have been." Also at trial, Vaughn introduced an identification card issued by Ronald E. Lane, Education Director, denominating Chester Vaughn, # 78173, as law clerk and giving a working schedule of 7:15 A.M. until 8:00 P.M.[9] All the credible evidence in this case establishes conclusively that Vaughn was named by the State to assist inmates with legal endeavors and that he was paid a salary therefor. The proof also shows that Vaughn performed legal services outside those hours in his cell and elsewhere. For the foregoing reasons, the court finds that Vaughn had a constitutional right to assist inmates with legal problems without official harassment or retribution for so doing. "The termination or denial of prison privileges because of a prisoner's legal activities on his own behalf *or those of other inmates* is an impermissible interference with his or her constitutional right of access to the courts." *Navarette v. Enomoto*, 536 F.2d 277, 280 (9th Cir. 1976), *rev'd on other grounds sub nom. Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (plaintiff's removal as prison law librarian made to punish or hamper legal activities) (emphasis added). Just as the state may not take steps to chill a prisoner's resort to the courts, *Lingo v. Boone*, 402 F.Supp. 768 (N.D.Cal.1975), neither may it punish or harass a prisoner for having sought judicial remedies. *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386 (1979). *See also, Haymes v. Montayne*, 547 F.2d 188, 189 (2d Cir. 1976), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977).

409 F.Supp. 1090 (S.D.Tex.1975), *aff'd*, 551 F.2d 68 (5th Cir. 1977).

8. The evidence supports the conclusion that for much of the time period in question, the other slot remained unfilled, and Vaughn was the

only designated law clerk at the prison. *See* note 3, *supra*.

9. A copy of this identification card is attached hereto as Exhibit A.

Before turning to the specific acts which are alleged to have violated Vaughn's constitutional right of access to the courts on behalf of himself and other prisoners, it is apparent that the only defendant left in this action vis-a-vis Vaughn is ex-Warden Thompson. No issue as to insulation from liability by way of a qualified immunity has been raised here; consequently, it will not be addressed as a defense. *See generally, Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

However, if there is to be liability, the alleged constitutional violations must have somehow been the personal responsibility of Thompson; it is now well-settled that officials cannot be held vicariously liable for the wrongdoing of others. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570, 580 (6th Cir. 1979) ("Liability under § 1983 may not be imposed upon an official simply on the basis of *respondeat superior.").*

This does not mean, however, that Thompson would have to personally do every act, perform every infringement, or even be personally present. To so hold would mean that § 1983 would preclude "recovery against public officials where those officials indirectly contribute to a deprivation of constitutional rights by merely maintaining policies which lead to that deprivation" which § 1983 clearly does not do. *Redmond v. Baxley,* 475 F.Supp. 1111, 1116 (E.D.Mich.1979).

Section 1983 only requires a *causal connection* between the official's conduct and the constitutional tort, *Monell, supra,* 436 U.S. at 692, 98 S.Ct. at 2036, 56 L.Ed.2d at 636, and § 1983 "should be read against the background of tort liability which makes a man responsible for the natural consequences of his actions." *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505 (1961), *overruled on other grounds, Monell, supra.*

Many of the acts complained of by Vaughn were committed by officers and personnel of the prison, and no doubt Thompson would argue that there can be no § 1983 liability for failure to supervise. The rule is, however, that liability will not lie under § 1983 where there is a *negligent* failure to oversee subordinates. *Redmond v. Baxley,* 475 F.Supp. 1111, 1116 (E.D.Mich. 1979), *citing, Leite v. City of Providence,* 463 F.Supp. 585, 589–90 (D.R.I.1978). "Inadequate supervision alone may be actionable, however, where the subordinate's abuses are so apparent that knowledge can be imputed to the supervisor, and the supervisor's failure to rectify the problem approaches recklessness." *Redmond v. Baxley,* 475 F.Supp. 1111, 1116 (E.D.Mich.1979) *citing Leite* at 590. *Redmond* clearly teaches that if Thompson had actual or imputed knowledge of the infringement of Vaughn's constitutional right of access to the courts, and there was a failure to rectify approaching recklessness, liability may result.

The court would also note that any act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See also Hickman v. Valley Local School District Board of Education,* 619 F.2d 606 (6th Cir. 1980).

Having laid the foregoing framework, the court will examine facts of this case as adduced at trial by a preponderance of the evidence as to the liability, if any, of ex-Warden Thompson to plaintiff Vaughn.

Vaughn and his witnesses testified that Vaughn was the target of both harassment and punishment for his law-related activities. As previously mentioned, defendant Thompson denied in his pretrial order that Vaughn was a law clerk at the prison and stated from the stand that he did not remember but that Vaughn might have been. In addition to the identification card (Exhibit A), the plaintiff submitted Exhibit No. P–2 which is an attempt by Vaughn to use the internal administrative appellate procedures and overturn a disciplinary "write-

up" which Vaughn had received from a guard whom Vaughn had reported for playing with his (Vaughn's) penis during a pat-down search.

In this document, Vaughn refers to himself as law clerk and goes into some detail about an inmate seeking legal assistance from him. Thompson presumably read this appeal because he denied it.[10] There can be no doubt that Thompson knew of Vaughn's law-related activities.

At times, Vaughn was the only law clerk available to approximately 2,500 inmates. Apart from legal assistance provided by court-appointed counsel in criminal cases, that was the extent of legal services provided by the State of Tennessee. Neither the private bar nor non-profit legal aid organizations came close to meeting the legal needs of the inmate population, and the defendants do not claim otherwise. In short, there was not an adequate alternative to mutual assistance with legal problems among the inmates as required by *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). For this reason, Vaughn's legal activities were protected by the Constitution from official interference. *See also* note 4, *supra*.

The record establishes that during his residence at the Tennessee State Penitentiary, Vaughn was singled out for harassment, punishment, and discrimination as a result of his law-related activities. One tactic involved humiliating strip searches. Vaughn was never found to be in possession of contraband while at the prison. Indeed, so far as the record reflects, he was never even suspected of possessing contraband. Nevertheless, he was subjected to strip searches, including visual rectal inspections, on three separate occasions in the last few months of 1977. Comments made to Vaughn during these public strip searches indicated that they were being made as reprisals for his legal activities. Once a

guard asked during a search whose toes Vaughn had been stepping on, or words to that effect. On another occasion, following a public strip search in the gymnasium under the gaze of scores[11] of inmates, the guard told Vaughn he could "file a writ on it," or words to that effect.

It was uncontraverted that strip searches are quite rare, except when an inmate is on "lock-up."

In addition to these, Vaughn was subjected to frequent pat down searches of his body which included feeling his genitals. These would sometimes occur three times a day; a day would be skipped, and there would be three the following day. Vaughn testified that these searches, both strip and pat down, made him feel humiliated, restless, paranoid—and resentful. The defendants did not dispute the fact that strip searches, when they occurred, were usually conducted in private, which tends to confirm the conclusion that Vaughn's public searches were designed to punish and humiliate the plaintiff. As for the pat down searches, they are routine for wood or metal working shops but rare otherwise. This, too, tends to confirm that Vaughn was singled out for discriminatory treatment.

On another occasion, a guard broke up a legal conference which Vaughn was having with another inmate, and, when Vaughn hit the wall, the guard told him that he (the guard) "had orders to stop jailhouse lawyering."

Cell searches of the plaintiff also proved to be quite disruptive. These searches (some fifteen in the last six months before his transfer) typically left Vaughn's files, legal documents, resource materials, etc., in shambles, requiring the plaintiff to expend substantial amounts of time reorganizing his materials to the point at which he could again begin work. Other cell searches during this period were rare unless there was probable cause to suspect the presence of

---

**10.** Choosing to ignore any merit in the appeal, and without investigation, Thompson denied it because the wrong defendant was listed. In actuality, there is no defendant listed at all. The adversarial style simply reads: "Officer

Terry Wilson and Tennessee Department of Corr. Vs. Chester Vaughn, Resident."

**11.** Vaughn testified that there were 150 people present.

contraband or unless there was a general "shake down" of a whole cell block. On one of these cell searches, the typewriter which Vaughn used in his legal pursuits was taken under the guise of checking its ownership; when it was returned, the return arm was bent.

Vaughn was subjected to verbal abuse on numerous occasions from prison officials. Once when going to an early meal, Vaughn was stopped by an officer who seized Vaughn's legal papers and threw them on the ground. The officer laughed as they were blown away by the wind.

The harassment of Vaughn pervaded other aspects of his daily routine. Assigned to small, two-man cells, Vaughn's cellmates were changed with unusual frequency. Vaughn testified that he had ten cellmate changes within six months. He indicated that this had rather predictable, unsettling, psychological consequences. The crowded conditions and close confinement made repeated new adjustments to different people and personalities difficult and served to keep Vaughn somewhat off balance. Cellmate changes were not common unless requested by the inmates involved.

The invidious treatment of the plaintiff culminated in his transfer from the Tennessee State Penitentiary to Fort Pillow State Farm in West Tennessee on February 7, 1978. The transfer came suddenly. It was a transfer which Vaughn had not requested and did not want. It also came at a time when the Nashville facility housed many prisoners who had already been signed to Fort Pillow and had been waiting for months for an opening at that facility so that they could be transferred away from Nashville. It was Thompson who signed the written transfer request. Thompson justified it on the basis that Fort Pillow had more programs available and the move placed Vaughn closer to home in Memphis. In fact, there were fewer programs such as "Positive Success" and "Meditation" at Fort Pillow,[12] and the transfer caused the plain-

tiff to lose his job as law clerk with a salary of $25.00 per month. The only family which Vaughn had in Memphis was an eight-year-old son. Vaughn was ashamed for his son to see him as a prisoner and never had a visit from him either before or after the transfer. Vaughn stated that he did not want to see his son while he was in the penitentiary because of the onus involved. Vaughn's other family resided in Indianapolis, Indiana.

Immediately upon his arrival at Fort Pillow, he was placed in punitive segregation ("the hole"). When he was removed two days later, the warden there told him that if he "messed with the minds" of any of the other prisoners, he would be locked up indefinitely. There was no job for him at Fort Pillow, but Vaughn did continue his legal activities.

The discrepancy between Thompson's explanation for the transfer and the realities of the situation is explained by the essentially uncontradicted testimony of one of the plaintiff's prisoner witnesses. Jerry Ricks testified that he was called to the warden's office in the administration building concerning an incident unrelated to Vaughn. He stated that he did not know Vaughn but knew of his reputation as a "writ writer." Ricks explained that there were three adjoining officers with their doors open. According to Ricks, Thompson "hollered" to prison official Gaither that Chester Vaughn was trying to take over the law library at the prison, and it was time to show him that he (Vaughn) did not run the institution. The ex-warden said they need a "lawyer" at Fort Pillow. Gaither told Thompson that there was a car going to Fort Pillow; apparently it was to be destined for Vaughn.

Although Thompson testified that it was his practice to require inmate transfers to be initiated by the prisoners' counselors or other subordinates, the written transfer request lacks any indication that it was initiated by anyone other than the warden himself.

12. This may be largely irrelevant, except as it relates to Thompson's state of mind. Vaughn testified that he did not participate in these programs because his legal efforts consumed all of his time.

On January 17, 1979, Vaughn was transferred back to the main prison in Nashville from Brushy Mountain. Thompson met Vaughn at the front gate (not a usual practice) and told Vaughn, "I know about you." Although not under disciplinary action, the plaintiff was immediately sent to "the hole" along with one Jimmy Richardson, while the other transferees were placed with the general population. Vaughn remained there for three days and was then placed on administrative lockup for an additional ten days. As required by this court's order in *Crafton v. Luttrell*, 378 F.Supp. 521 (M.D. Tenn.1974), Vaughn's confinement was reviewed by an administrative panel. That panel could find no justification for the plaintiff's segregation and ordered him released.

The court concludes that this overall pattern of harassment may fairly be imputed to ex-warden Thompson either as a result of an officially sanctioned policy or because the harassment was so visible and well known to Thompson that he was reckless in failing to abate the constitutional abuses. While trial testimony proved Thompson's rancor toward jailhouse lawyers in general, he had special reason to resent Vaughn. Vaughn was actively involved in assisting plaintiff's counsel in the case of *Trigg v. Blanton*, a state court class action challenging the constitutionality of the conditions of confinement in Tennessee's prison system, including the conditions at Thompson's prison.

Thompson resented that suit. Thompson was unable to refute the testimony of George Dean, an impartial, nonparty witness now employed as a lawyer with the Metro Legal Department. Dean testified that one night, as he was leaving the penitentiary, Thompson called Dean into his office. Thompson asked Dean how he (Thompson) could "short circuit" the *Trigg* litigation. Thompson asked about the feasibility of a counter petition. Dean testified that Thompson was totally against the suit in which Vaughn was so visible and that Thompson took it as a personal affront.

It is also significant, regardless of whether he initiated the scheme, that Thompson gave active support and encouragement to a prisoner who circulated petitions which would limit the *Trigg* litigation to the single issue of overcrowding, rather than the broader issue of conditions generally. Prisoners were induced to sign the petition by extravagant claims that if enough prisoners signed, the state would release large numbers of prisoners in a dramatic bid to reduce the prison population. Thompson entreated inmates to sign, saying that he could make things better than *Trigg*. One witness saw special passes given to inmates for the purpose of circulating the petition.

Vaughn and another prisoner drafted a petition in opposition to that supported by Thompson and attempted to circulate it. Rumors abounded and tension mounted. There was testimony that signers of the Vaughn petition were confronted by Thompson demanding to know why they had signed it. They would reply that they though they were ordering Bibles, and Thompson would make them retract their signatures.[13] Vaughn reported threats on his life, and for five or six days tension was very high. Vaughn's efforts brought the matter to the attention of the trial court in *Trigg*, and he eventually succeeded in ending the petition which Thompson had supported. In addition, the trial court entered an order putting the parties in *Trigg* on notice that it would not tolerate any attempts to influence or intimidate any parties or witnesses in the action. That order came in the closing days of 1977, approximately five weeks before Vaughn was transferred. Indeed, because of the nature of the court's order, Thompson may have felt inhibited over transferring Vaughn un-

---

13. Inmate Ray Thompson testified that when he refused to retract his signature, the ex-warden threatened that he would lose his (very desirable) job at a time when there was a waiting list for jobs. Ray Thompson did lose that job when he was subsequently transferred to Fort Pillow for "rehabilitation." It was stated that Vinson Thompson called Ray Thompson's counselor to his office and ordered a reclassification on the spot.

til after *Trigg* was tried. It is apparent, however, that within days of the conclusion of the trial in that matter Thompson initiated the preemptory transfer to Fort Pillow.[14]

Significantly, with minor exceptions, the defendants did not dispute the plaintiff Vaughn's detailed allegations that he was treated in a punitive and discriminatory fashion. Thompson merely claimed that he never gave his staff direct orders to engage in such harassment or misconduct. As set forth above, such a response is inadequate where Thompson knew of the unconstitutional actions and reprisals. Thompson circulated frequently through the yard and operation areas of the prison and made it known to staff and prisoners alike that he did not like jailhouse lawyers or their activities. By word and deed he conveyed an unmistakable message: life was to be made unpleasant for Vaughn and people like him. Thompson's personal conduct toward jailhouse lawyers in general, and Vaughn in particular, made specific orders unnecessary.

At trial, the defendants made much of the freely admitted fact that Vaughn accepted gratuities for legal work done on behalf of prisoners after his official hours as law clerk. There was evidence that this was a common practice among jailhouse lawyers. Vaughn testified that Thompson knew of the practice and did not object to it. Defendant Griggs, who is in charge of enforcing prison rules, was not sure of the existence of a rule against such remuneration for legal services, but he though there was one. If such a rule existed, it was not written down nor available to the prison population. In any event, Thompson never cited a rule violation as justification for the mistreatment of Vaughn.

The court finds that, under the cases previously cited, Thompson was sufficiently knowledgeable of his subordinate's infringement of Vaughn's constitutional rights, and he acquiesced[15] sufficiently therein to support liability under § 1983. *See* the analysis in *Landman v. Royster*, 354 F.Supp. 1302, 1316–18 (E.D.Va.1973).

Alternatively, the court finds that Thompson engaged in direct action of a *Mt. Healthy*[16] variety which constituted an impermissible act of retaliation for the exercise of a federally protected constitutional freedom. Specifically, the court rules that Thompson's transfer of Vaughn to Fort Pillow was a reprisal for Vaughn's activities as a jailhouse lawyer. At first blush this may appear to conflict with the rule set forth by the Supreme Court in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) which states that "prison officials have discretion to transfer him for whatever reason or no reason at all." 427 U.S. at 228, 96 S.Ct. at 2540, 49 L.Ed.2d at 261. However, it does not. *Meachum* and its companion case, *Montayne v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) established that there is no due process right to a hearing prior to a transfer; they did not hold that transfers could be made in retribution of protected rights. As set forth hereinabove and here repeated for emphasis, an act of retaliation under color of state law for the exercise of one's constitutional rights, even if the act complained of would have been proper if done for a legitimate reason, is actionable under § 1983. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This analysis found favor in *Buise v. Hudkins*, 584 F.2d 223, 229–30 (7th Cir. 1978) *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). That court ruled that "while plaintiff may not have a due process interest or expectation in remaining at the same institution, he does have a First Amendment interest or expectation in not being punished for the exercise of activity protected under that provision." *Id.* at 230.

---

**14.** *See Chester Vaughn v. C. Murray Henderson*, 617 F.2d 604 (6th Cir. 1980) (prison transfers to avoid § 1983 Liability condemned).

**15.** *See Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972).

**16.** *Mount Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

While there may be many good and legitimate administrative or disciplinary reasons for transfers of state prisoners, there is also no question that such action can be replete with punitive characteristics. Judge Kaufman catalogued some of these in *United States v. Montanye*, 505 F.2d 977 (2d Cir. 1974), *rev'd on other grounds*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). He noted that a transfer may result in a prisoner being sent hundreds of miles from family and friends such that he is cut off from his only contact with the outside world. He also leaves behind friends and associates at the old prison and is forced to adjust to a new environment in which he may be regarded as a troublemaker. Contacts with counsel are more difficult. Sometimes an inmate is placed in administrative segregation upon arrival at the new prison. Personal belongings are often lost. He may be deprived of facilities for medical or psychological treatment. Educational and rehabilitational programs can be interrupted or diminished. The fact of the transfer and perhaps the reasons therefor will be put into the record viewed by the parole board, and the prisoner may have difficulty, especially after some time has passed, in refuting adverse inferences arising from that record. 505 F.2d at 982. This court notes that an inmate may also lose his job, as did the plaintiff here.

Turning then to the evidence proffered in the case *sub judice*, it is the determination of this court that it is more likely than not Vaughn's transfer to Fort Pillow was a direct result of his activities as a jailhouse lawyer. As such, it was a retaliation for the exercise of a constitutional freedom which is guaranteed protection. Section 1983 provides for damages against every person who, under color of state law, subjects any citizen or causes any citizen to be subjected to a deprivation of any rights, privileges, or immunities secured by the Constitution. Here, defendant Thompson deprived the plaintiff Vaughn of his consti-

tutional right to free and meaningful access to the courts through a pattern of acquiescence in, and even approval of, the unconstitutional behavior of the ex-warden's subordinates. That is the equivalent of causing Vaughn to be subjected to constitutional deprivations. In addition, Thompson actively subjected Vaughn to unconstitutional actions by taking punitive measures, e. g., the transfer to Fort Pillow, in retaliation for Vaughn's having engaged in constitutionally protected activity.

Accordingly, the defendant Thompson is liable in money damages to the plaintiff Vaughn. The assessment of those damages, however, is somewhat problematical, as it is in all cases of this nature. The Supreme Court has noted this difficulty sympathetically in the case of *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The Court traces the general applicability of tort damage principles to civil rights actions but also notes that various constitutional violations may not be directly analogous to some branch of common law torts. 435 U.S. at 257–58, 98 S.Ct. at 1048–49, 55 L.Ed.2d at 261. The evaluation of constitutional denials by state officials requires creativity as well as sensitivity from the courts.

The Sixth Circuit, citing a number of Supreme Court cases, including *Carey v. Piphus, supra*, has made it abundantly clear that once a civil rights violation is found, out-of-pocket expenses and damages for emotional distress are appropriate. The Supreme Court used the word "distress" to include mental suffering and emotional anguish.[17] 435 U.S. at 264, 98 S.Ct. at 1052, 55 L.Ed.2d at 265 n. 20. Damages are recoverable for distress even though they are necessarily subjective. "Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." 435 U.S. 263–64, 98 S.Ct. at 1052, 55 L.Ed.2d 265. It is also notable that

---

17. The court also noted with apparent approval the case of *Sexton v. Gibbs*, 327 F.Supp. 134 (N.D.Tex.), *aff'd*, 446 F.2d 904 (5th Cir. 1971) *cert. denied*, 404 U.S. 1062, 92 S.Ct. 733, 30

L.Ed.2d 751 (1972), which awarded damages of $5,000 where plaintiff suffered "humiliation, embarrassment and discomfort" as a result of a false, warrantless arrest.

"[h]umiliation can be inferred from the circumstances as well as established by the testimony." *Seaton v. Sky Realty Company, Inc.*, 491 F.2d 634, 636 (7th Cir. 1974) (discrimination in housing).

 The court will proceed first to examine out-of-pocket expenses sustained as a result of Thompson's retaliatory and illegal transfer of Vaughn to Fort Pillow State Farm in early February, 1978. The transfer resulted in Vaughn's immediate loss of his law clerk job which was not restored until July 1979. His monthly income was therefore reduced from the $25.00 he was making at that job at the time of transfer to $5.00 per month. The court will award lost wages for a period of seventeen (17) months at $20 per month, for a total of $340.00 lost wages.

 Before discussing the emotional distress, embarrassment, humiliation, frustration and discomfort Vaughn suffered at the Tennessee State Penitentiary, the court would note that the right of reasonable access to the courts is perhaps the most cherished of all constitutional guarantees. This is so because without it none of the other rights which the Constitution guarantees would be secure. The threat of being unable to reach the haven of judicial protection during storms of oppression would be taxing on any citizen; to one confined and at the mercy of his custodians the anguish increases exponentially. Even the smallest deprivations are magnified by tight confinement, and this must be weighed in the balance when evaluating compensatory damages for emotional distress.

> [E]very prisoner has a constitutional right of access to the courts to present any complaints he might have concerning his confinement. He cannot be disciplined in any manner for making a reasonable attempt to exercise that right.

Access to the courts is a fundamental precept of our system of government. No citizen, regardless of his transgressions, is ever to be legally consigned to the total and unreviewable power of any single branch of government. To make the system work, to maintain the proper checks and the proper balance, no person subject to the power of government can be denied communication with or access to each of the three spheres of governmental authority. This principle serves the highest interests of government, as much as it serves the individual.

*Andrade v. Hauck*, 452 F.2d 1071, 1072 (5th Cir. 1971).[18]

Violations of civil rights, where there are no actual damages, are often associated with dignitary wrongs, and substantial awards of compensatory damages are permitted. *See generally*, Dobbs, *Handbook of the Law of Remedies*, § 7.3 (1973). The court has reviewed a large number of damage awards under § 1983 and, predictably, has found wide variance in the courts' treatment. In *United States ex rel. Larkins v. Oswald*, 510 F.2d 583 (2d Cir. 1975) a jury awarded the plaintiff $1,000 for the imposition of twelve days of solitary confinement without due process of law. Where a prisoner was placed in segregated confinement under conditions of severe physical deprivation, needless degradation, loss of rehabilitative opportunities, and great mental anguish, the court awarded compensatory damages of $9,300 and punitive damages of $3,270. *Sostre v. Rockefeller*, 312 F.Supp. 863 (S.D.N.Y.1970), *rev'd in part sub nom. Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971) (punitive damages denied), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

For being confined nude in an isolation cell without furnishings on several occasions

---

**18.** This court is unpersuaded by the logic of some courts which have held that, where a plaintiff has, in fact repeatedly filed briefs, motions, and suits with various courts, he cannot have been denied access to the court. While this may be true in the strict sense, it would make a denial of access to the courts remediless because an intimidated prospective plaintiff would never reach the court which could provide the remedy. The better rule is that it is the *attempt* to prevent access which is actionable, although a complete denial of court access, should it ever come to light, would be even more egregious. *Compare Conway v. Oliver*, 429 F.2d 1307, 1308 (9th Cir. 1970).

for several days, the district court awarded a prisoner $1,500 in compensatory damages which was sustained by the appellate court. *Wright v. McMann*, 321 F.Supp. 127 (N.D.N.Y.1970), *aff'd in part*, 460 F.2d 126 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). *See also Mack v. Johnson*, 430 F.Supp. 1139 (E.D.Pa.1977), *aff'd* 582 F.2d 1275 (3d Cir. 1978) (civil rights damages on a per diem basis).

One of the largest awards for a prisoner under § 1983 was $130,000 to a rape victim who was raped as a result of prison officials' deliberate indifference to his personal safety. *Redmond v. Baxley*, 475 F.Supp. 1111 (E.D.Mich.1979). *See generally*, Annot., *Civil Rights—Damages—Emotional Distress*, 40 A.L.R.3d 1290 (1971).

"It is apparent that the right of access to the courts triggers a high standard of review once it is determined that a prison administration has, by regulation, practice or a single act, diminished the availability of a judicial forum to hear a prisoner's grievance." *Laaman v. Perrin*, 435 F.Supp. 319 (D.N.H.1977). It is the determination of this court that a preponderance of the evidence establishes that ex-warden Thompson knew of the harassing, discriminatory, and invidious treatment of Vaughn by prison officials as a result of Vaughn's legal activities; that Thompson acquiesced therein; and that he was ultimately responsible therefor. See the reasoning in *Wright v. McMann*, 460 F.2d 126, 134–35 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972) (warden responsible for condition of "strip cells" maintained by his subordinates).

The acts perpetrated against Vaughn by prison officials were constant, public, humiliating, frustrating, and illegal. They caused Vaughn significant amounts of emotional upset, outrage, resentment, and mental distress. He became restless and even somewhat paranoid. He was fearful and constantly on edge. Vaughn was transformed into a lightning rod which constantly attracted official retribution,[19] and for that reason he was effectively isolated from social contact with fellow prisoners.[20] For the emotional trauma thus induced through a persistent pattern of violations of Vaughn's constitutional rights, defendant Thompson is liable in the amount of $1,200.00. Plaintiffs who prove only intangible loss and mental suffering may be awarded substantial compensatory damages in a civil rights action. *Rivera Morales v. Benitez de Rexach*, 541 F.2d 882 (1st Cir. 1976).

In addition, Thompson violated Vaughn's constitutional rights by transferring Vaughn in retribution for his activities as a jailhouse lawyer. "Plaintiff must establish by substantial evidence that the real motivating factor for his transfer, whether conscious or unconscious, was his writ writing activities .... It is not necessary that plaintiff establish that defendants actually intended to violate his constitutional rights, but only that their acts have that effect. *Roselli v. Noel*, 414 F.Supp. 417 (D.R.I. 1976)." *Laaman v. Perrin*, 435 F.Supp. 319 (D.N.H.1977). The court finds that Thompson violated Vaughn's civil rights to a significant degree by and through this transfer and that Vaughn is entitled to a damage award of $500.00.

Punitive damages will not be awarded. Thompson is no longer a warden in charge of inmates, and the court is of the opinion that the plaintiff will be made whole and the ends of justice sufficiently served with the award of compensatory damages.

Plaintiff received the very able and commendable assistance of counsel from Legal Services of Middle Tennessee, Inc., and attorney's fees have been requested. Legal services organizations may recover fees under the Civil Rights Attorney's Fees Awards Act of 1976. 42 U.S.C. § 1988.

---

**19.** For example, affidavits in the record relate that inmates walking from the ball field were seized and strip searched along with Vaughn, apparently for no reason other than the fact that they were in Vaughn's company.

**20.** Of course, this has a direct and negative bearing upon the right of mutual legal assistance among inmates.

*Lund v. Affleck*, 587 F.2d 75 (1st Cir. 1978). Accordingly, a hearing will be set to determine the amount of reasonable attorney's fees.

An appropriate order will be entered.

### EXHIBIT A

RIVER BEND SCHOOL
RESIDENT EMPLOYEE

Library
Law Clerk
NAME & NO. CHESTER VAUGHN #78173

WORKING SCHEDULE 7:15a.m. - 8:00p.m.

EXPIRATION DATE 12-31-77

*Ronald E. Lane*